UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARCKUS WILLIAMS, on behalf of himself and those similarly situated; and FAIR HOUSING CENTER OF CENTRAL INDIANA, | **Case No. 1:24-cv-2050** **JURY TRIAL DEMANDED** **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| PROGRESS RESIDENTIAL, LLC; PROGRESS RESIDENTIAL PM HOLDINGS, LLC; PROGRESS RESIDENTIAL MANAGEMENT SERVICES, LLC; PROGRESS RESIDENTIAL PROPERTY MANAGER, LLC; and PRETIUM PARTNERS, LLC, | |
| Defendants. | |

## <u>INTRODUCTION</u>

1.      Plaintiffs Marckus Williams, on behalf of himself and those similarly situated, and Fair Housing Center of Central Indiana ("FHCCI") bring this action pursuant to the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.,* and the Indiana Fair Housing Law, Ind. Code Ann. § 22-9.5 *et seq.*, for injunctive, monetary, and

declarative relief against Defendants Progress Residential, LLC; Progress Residential PM Holdings, LLC; Progress Residential Management Services, LLC; Progress Residential Property Manager, LLC; and Pretium Partners, LLC (collectively, "Progress" or "Defendants") for engaging in a pattern and practice of illegal discrimination on the basis of race in the marketing and rental of housing units.

2.    Progress is the largest owner and manager of single-family rental homes in the nation, with over 90,000 single-family homes that extend across 38 metropolitan areas in 19 states. That includes Indiana, where Progress owns and manages more than 2,800 homes in five Central Indiana counties alone.

3.    Throughout all of its single-family rental homes, Progress maintains an ongoing policy and practice of automatically denying applicants when their screening report shows a record of: (1) any felony convictions within the past ten years, (2) convictions for certain felonies regardless of when they occurred, or (3) convictions for certain misdemeanors within the past three years. Progress advertises this policy on its website, where it states that applications "will be denied for the [above] criminal convictions[.]"

4.    Progress does not inquire into whether the information on an applicant's screening report is correct. Nor does it take into account any relevant facts beyond the report, such as the conditions surrounding the purported offense or

any evidence of changed circumstances. Rather, if an applicant's screening report shows any felony or misdemeanor record covered by

5.     Progress's policy, they are automatically disqualified.

6.     This is precisely what happened to Plaintiff Marckus Williams. Mr. Williams, who is a Black man, applied to rent a Progress home in Indianapolis and paid an application fee. His screening report showed three prior criminal convictions. Had Progress inquired further, it would have learned that two of the listed convictions had been expunged, and one was not a conviction at all. But Progress did not inquire into the convictions on Mr. Williams's screening report, nor did it give Mr. Williams an opportunity to provide this or other relevant information. Progress applied its blanket ban, and automatically denied Mr. Williams's rental application.

7.     Mr. Williams's struggle to find housing eventually brought him to FHCCI, a local non-profit organization that promotes open access to housing, including through activities and programs that facilitate open housing access for those with histories of incarceration. FHCCI counseled Mr. Williams on his rights and housing options.

8.     FHCCI undertook a comprehensive investigation into Progress's practices and their discriminatory effects. This investigation included investigative calls to ascertain the scope of Progress's criminal history policy. Through these

investigative calls, FHCCI confirmed that Progress does in fact apply the categorical ban described on its website and applied to Mr. Williams to all applicants, and that this policy applies to all Progress homes nationwide.

9.    Progress's exclusionary criminal history policy has a racially disparate impact on Black[1] rental applicants. Nationally, and in the markets where Progress is active, there are wide racial disparities at every step in the criminal legal process. Black people are more likely than white people to be stopped by law enforcement, arrested, convicted, and imprisoned at the federal, state, and local levels. Thus, Progress's categorical criminal history policy has a significant, disproportionate, and predictable adverse impact—exclusion—on otherwise-qualified Black applicants.

10.    Mr. Williams is just one of hundreds, if not thousands, of Black individuals who have been discriminated against by Progress's policy of not renting to certain justice-involved applicants.[2] Each of these applicants, when rejected, experienced direct and compensable harm. As such, Mr. Williams brings his claims on behalf of not only himself, but all Black applicants who were otherwise qualified to rent with Progress but were automatically rejected from tenancy based on Progress's criminal history policy.

---

[1] Throughout this complaint, "white" refers to non-Hispanic white individuals, and "Black" refers to non-Hispanic Black individuals.

[2] The term "justice-involved," as used throughout this Complaint, refers to individuals who have had prior contact with the criminal legal system via arrest, conviction, incarceration, or similar events.

11.    Progress's continuing policy of refusing to rent to certain justice-involved applicants has also directly and significantly impaired FHCCI's mission and its ongoing programs and activities, including its housing counseling and referral services, its neighborhood stabilization and community investment programs, and its education and outreach efforts.

12.    There is an obvious and ready-made less discriminatory alternative for addressing any concerns Progress may raise regarding the potential tenancy of applicants with criminal records: individualized review. Guidance issued by the U.S. Department of Housing and Urban Development ("HUD") in 2016 and again in 2022 recommends individualized review as a less discriminatory alternative to categorically banning certain justice-involved applicants. For years, major industry organizations have disseminated information about this guidance and emphasized the importance of dispensing with blanket bans.

13.    Plaintiffs accordingly bring this suit to prevent Progress from continuing its discriminatory and unlawful conduct; ensure that applicants injured by Progress's practices will have a meaningful opportunity to secure desperately needed rental housing; and redress the harm Plaintiffs have suffered as a direct result of Progress's conduct.

## PARTIES

14.     Plaintiff Marckus Williams resides in Indianapolis, Indiana. He brings this case on behalf of himself and a class of similarly situated individuals.

15.     Plaintiff FHCCI is a not-for-profit corporation headquartered in Indianapolis, Indiana. FHCCI is dedicated to promoting safe, affordable, and accessible housing for all individuals. Its programs and activities in furtherance of this mission include providing counseling and referrals to individual housing consumers and housing providers, neighborhood stabilization and community investment work, and supporting legislation that will promote open access to housing.

16.     Defendant Progress Residential PM Holdings, LLC ("PRPM") is incorporated in Delaware with its principal place of business in Arizona. PRPM was founded in July 2014. By and through its subsidiaries, PRPM owns, manages, and/or operates tens of thousands of single-family rental homes across the United States.

17.     Defendant Progress Residential, LLC is incorporated in Delaware with its principal place of business in Arizona. Progress Residential, LLC was founded in March 2015. By and through its subsidiaries, Progress Residential, LLC owns, manages, and/or operates tens of thousands of single-family rental homes across the United States.

18.     Defendant Progress Property Manager, LLC ("PPM") is incorporated in Delaware with its principal place of business in Arizona. It was founded in July 2014. By and through its subsidiaries, PPM manages and/or operates tens of thousands of single-family rental homes across the United States

19.     Defendant Progress Residential Management Services, LLC ("PRMS") is incorporated in Delaware with its principal place of business in Arizona. PRMS was founded in March 2018. By and through its subsidiaries, PRMS manages and/or operates tens of thousands of single-family rental homes across the United States.

20.     Defendant Pretium Partners, LLC ("Pretium") is incorporated in Delaware with its principal place of business in New York. Pretium was founded in April 2014. It is a privately held investment management firm focused on residential real estate. By and through its subsidiaries, it owns, manages, and/or operates tens of thousands of single-family homes across the United States.

21.     In acting or omitting to act as alleged herein, Defendants were acting through their employees, officers, directors, agents, successors, assignees, affiliates, predecessors, parents or controlling entities, and/or subsidiaries and are liable on the basis of the acts and omissions thereof.

22.     In acting or omitting to act as alleged herein, each employee or officer of Progress was acting in the course and scope of their actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or

officer as a Progress agent were subsequently ratified and adopted by Progress as principal.

23.     Each Defendant participated in the acts and/or omissions at issue, acted in concert with, or acted as an agent or servant of other Defendants.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613. This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

25.     Venue is proper in this district under 28 U.S. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims took place in Indianapolis, Indiana.

## FACTUAL BACKGROUND

**I.     Progress Owns and Manages Tens of Thousands of Single-Family Rental Homes in Cities Around the Country**

26.     Progress is the largest owner and manager of single-family rental homes in the United States, with a portfolio of approximately 90,000 single-family homes across 38 markets in 19 states.

27.     New York-based investment firm Pretium Partners holds itself out to be "a pioneer in the single-family industry since 2012" and "the leading owner and operator of single-family residential in the United States."[3]

28.     Backed by Pretium Partners, Progress Residential was founded in 2014 as a real estate venture seeking to "capitalize on the severe distress in the residential real estate market in the United States" after the 2008 U.S. housing crash.[4]

29.     Progress Residential is "Pretium's wholly owned affiliate, established . . . to support its residential real estate strategy by providing institutional-quality technology-enabled services across portfolio construction, renovation, leasing, and property management."[5] Pretium and its subsidiaries, Progress Residential PM Holdings and Progress Residential, LLC, own and/or operate the Progress portfolio.

30.     Progress's reach extends across 19 states. As of 2024, for example, Progress owned almost 18,000 homes in Florida, over 15,000 homes in Georgia, and around 8,000 homes in Arizona.

---

[3] *State of ESG: April 2023*, Pretium, 5 (2023) https://pretium.com/wp-content/uploads/2024/05/FINAL-Pretium-State-of-ESG-Report-2022.pdf [https://perma.cc/N9BM-CLBV].

[4] Peter Whoriskey et al., *This block used to be for first-time homebuyers. Then global investors bought in.*, The Wash. Post (Dec. 15, 2021), https://www.washingtonpost.com/business/interactive/2021/investors-rental-foreclosure/ [https://perma.cc/C55L-6AP8].

[5] *Supra* n.3.

31.     Since its formation, Progress's portfolio has steadily grown, acquiring as many as 2,000 houses a month through a computerized property-search algorithm and all-cash offers.

32.     In Central Indiana alone, Progress owned 2,852 homes in just five counties as of July 2024, and its portfolio is growing. In Marion County, for example, Progress's portfolio increased by 15% in one year, from 1,301 single family homes in 2023 to 1,494 as of July 2024.

33.     In 2016, Progress internalized all property-management functions for leasing, property turnover, repairs, and rent collection. Progress Residential PM Holdings, LLC, Progress Residential Management Services, LLC, Progress Residential Property Manager, LLC, and subsidiaries manage the Progress homes across the country, providing resident-facing services including marketing, leasing, renovations, maintenance, and resident support and services. PRMS also advertises management services on the Progress Residential website to third party investors with mid-to-large single-family rental home portfolios.

34.     Interested applicants can search for available homes for rent, find rental criteria and other information, schedule a self-tour, and apply to rent directly through Progress's website.

35.     Defendants and their subsidiaries jointly make and enforce their criminal history policy.

## II.     Progress Automatically Rejects Applicants on the Basis of Justice Involvement, Which Constitutes Unlawful Discrimination

### A. Progress Automatically Rejects Applicants with Any Felony Conviction Within the Past Ten Years, Certain Types of Misdemeanors Within the Past Three Years, or Certain Types of Felonies Regardless of Time

36.     When a person applies to a Progress property, Progress screens the applicant using a report from a third-party screening provider. Each applicant must pay a nonrefundable $50 application fee.

37.     The screening report contains a multi-state criminal background search report for the applicant. It also provides a consumer credit report and rental history report and establishes a renter "score" based on the information found therein.

38.     Progress categorically rejects all applicants whose screening report shows any felony convictions within the past ten years; certain felonies regardless of when the offense occurred; or certain misdemeanors within the past three years.

39.     Progress's criminal history policies are advertised on its website, which lists a Criminal Background Check among its Qualification Criteria, and states that applications "will be denied" for the following convictions:[6]

---

[6] *Qualification Criteria*, Progress Residential, https://rentprogress.com/qualification-criteria/ (Sept. 2022 screenshot). Progress appears to have updated the language about this policy on its website, but investigative calls as recently as June 2024 have confirmed that this blanket policy is applied to all Progress homes, regardless of location.

---

**Criminal Background Check**

A criminal background check will be completed for each applicant. The Lease Application will be denied for the following criminal convictions:

- For felony offenses involving crimes against children, sex-related offenses, homicide, kidnapping, and drug sale, manufacturing, or distribution, or any felonies within the past 10 years.
- For misdemeanors offenses involving crimes against persons, property, or animals, financial crimes;(e.g. bad check, identity theft, fraud), and other drug, prostitution, and/or weapons related offenses within the past 3 years.
- Most other misdemeanor offenses (e.g. traffic or alcohol-related offenses), will not decline the Applicant.

---

40.     Thus, as Progress's website makes clear, Progress will automatically deny applicants if their records reflect (1) any felony convictions within the past ten years, (2) one of the other enumerated felony offenses, regardless of when they took place, or (3) one of the listed categories of misdemeanor offenses within the past three years.

41.     Progress's earlier marketing materials confirm that it has consistently applied a categorical ban on applicants with justice involvement. For example, a Progress "Future Resident Guide" from 2018 established that leasing applications "will be denied" for similarly sweeping categories of convictions with the same time period.[7] That form made clear that applications showing felony *or misdemeanor* convictions for certain enumerated offenses would be "declined regardless of time"; applications with certain other enumerated offenses would be declined within 10 years for felonies and 3 years for misdemeanors; and traffic, alcohol-related, and "*all other*" felony offenses would be declined if within 10 years:

---

[7] *Future Resident Guide*, Progress Residential, 6 (2018), https://photos.harstatic.com/183313289/supplement/pdf-2.pdf?ts=2020-03-06T09:04:21.137 [https://perma.cc/AF3K-QVU7].

## CRIMINAL HISTORY

A criminal background check will be completed for each applicant. The Lease Application will be denied for criminal activity of any applicant that has resulted in a conviction within the time period prior to the Lease Application date, as follows:

| OFFENSE | FELONY | MISDEMEANOR |
|---|---|---|
| Crimes against children | | |
| Sex-related offenses | | |
| Homicide | Declined regardless of time | |
| Kidnapping | | |
| Drug sale, manufacture, distribution | | |
| Other crimes against persons, property, or animals | 10 years | 3 years |
| Financial crimes (e.g., bad check, identity theft, fraud) | 10 years | 3 years |
| Other drug, prostitution, and/or weapons-related offenses | 10 years | 3 years |
| Traffic, alcohol-related, all other offenses | 10 years | 0 years |

42.    For these justice-involved applicants, Progress does not consider any mitigating information, such as whether the applicant has a stable rental and/or employment history, their age at the time of the offense, character references, or evidence of changed circumstances. Nor does Progress differentiate between the type of felony conviction, how long ago the felony conviction was (within its ten-year lookback period), or whether the felony or misdemeanor conviction appearing on the screening report has been expunged, sealed, or otherwise legally nullified.

43.    Nor does Progress provide an appeals process by which an individual who is rejected based on apparent prior justice-involvement can appeal that determination, present mitigating information, or otherwise receive an individualized review.

13

## B. Mr. Williams Was Adversely Affected by Progress's Discriminatory Policy

44.     Mr. Williams lives in Indianapolis with his wife and baby. More than a decade ago, he spent time in prison for drug possession offenses. Since his release, he has worked hard to move forward and contribute to his community. Mr. Williams has since become a business owner and community leader, founding a grocery store in a former "food desert" in Indianapolis.[8] Yet, Mr. Williams is one of many individuals impacted by Progress's categorical ban.

45.     On or around December 7, 2022, Mr. Williams and his ex-fiancée applied to rent a Progress home located at 1014 S. Tanninger Dr., Indianapolis, IN 46239. They submitted an application and paid all associated fees and deposits, including a $50 application per person (for a total of $100), a $35 credit card processing fee, and a $250 hold fee.

46.     Mr. Williams and his then-fiancée met all rental criteria, including credit, income, rental history, and age qualifications. Specifically, Progress requires that applicants be 18 years or older, have a household net income of 2.5 times the monthly rent, have a favorable credit history with no open bankruptcies, and have

---

[8] "Food deserts" are "neighborhoods and communities that have limited access to affordable and nutritious foods." Nat'l Rsch. Council, *The Public Health Effects of Food Deserts: Workshop Summary* 1 (2009), https://www.ncbi.nlm.nih.gov/books/NBK208016/ [https://perma.cc/GZF8-64RK].

no previous evictions or unpaid rent. Mr. Williams and his then-fiancée met all of these requirements.

47.    On December 8, 2022, Mr. Williams and his ex-fiancée received an e-mail notifying them that their "[a]plication [was] being reviewed" and requesting verification of identity and income.

48.    However, before he was able to submit that information, on the following day, December 9, 2022, Mr. Williams received an Adverse Action Letter from the screening company on behalf of Progress, stating "[a]t this time we are unable to approve your application." The letter further states "[t]his decision was based on information contained in a consumer report[.]"

49.    The week before this rejection, Mr. Williams had received a copy of his report from the same screening company associated with his application to rent from another company. From that copy, he learned that the screening report showed three prior felony convictions: a guilty plea for three counts of possession of a controlled substance on September 10, 2012; a "plea by agreement" for a single count of possession of a controlled substance on January 27, 2017; and a conviction for a single count of possession of cocaine or narcotics on April 20, 2006.

50.    Mr. Williams's screening report confirmed that he was otherwise qualified for the Progress unit. Mr. Williams's income qualifications, credit history, and age met Progress's stated requirements, and he did not have any negative rental

history. The same was true of his then-fiancée. The only information in the report that would conflict with Progress's policies was the felony convictions appearing in his report within the ten years preceding his application. Mr. Williams understands his history of justice involvement to be the sole reason for his denial from the Progress unit to which he and his then-fiancée applied.

51.    Progress did not give Mr. Williams an opportunity to provide any information about the convictions appearing on his report. Had it done so, Progress would have learned that the 2012 and 2006 convictions had been expunged from Mr. Williams's record prior to this application. Progress would have also learned that the "conviction" from 2017 was in fact not a record of a criminal offense at all. Rather, it was a record of Mr. Williams's participation in a court-ordered program after a period of incarceration to help him reenter the community and make positive life changes.

52.    Progress would have also learned that in the eight years since his last conviction, Mr. Williams had built a business and been a responsible tenant for seven years. Instead, Progress applied its blanket ban and automatically rejected Mr. Williams and his then-fiancée.

53.    Mr. Williams felt humiliated by the swift denial from Progress. Mr. Williams felt that he was denied housing based on stereotypes about individuals with justice involvement. In addition, despite meeting rental qualifications and being able

to afford a home, Mr. Williams was unhoused for almost one month after Progress's denial.

54.     Mr. Williams subsequently worked with an attorney to get the inaccurate information removed from his record and to get the 2017 record expunged. In that process, he met Plaintiff FHCCI.

## C. FHCCI's Investigation Revealed Progress's Policy Against Renting to Certain Justice-Involved Individuals Is Robust and Nationwide

55.     Given the potential implications of Progress's ongoing policy on FHCCI's efforts to facilitate open housing, and in light of Mr. Williams's experience, FHCCI was compelled to investigate Progress's policy further. FHCCI's investigation included investigative calls and online research, both conducted by trained employees following standardized protocols, including making a contemporaneous record of their interactions.

56.     FHCCI conducted four investigative calls and one online chat conversation between September 2023 and June 2024 to ascertain the scope of the categorical ban Progress describes on its website and applied to Mr. Williams. FHCCI's investigative calls confirmed that: (1) Progress enforces the policy described on its website—it automatically denies applicants with any felonies within the past ten years, certain misdemeanors within the past three years, and certain felonies regardless of time; and (2) this categorical ban is not limited to Indiana, but it applies broadly to all Progress properties throughout the country.

57.    First, in November 2023, an FHCCI employee conducted an investigative call to Progress's general line, 833.PRG.RESS (833-774-7377). The FHCCI employee said they had some general questions about the rental qualifications. A Progress agent referred the FHCCI employee to customer care representative Teresa. The FHCCI employee represented that they were a social worker working with their church working to help church members who had criminal backgrounds find housing.

58.    Teresa confirmed that felonies and misdemeanors automatically disqualify applicants from living at Progress properties. While Teresa was not independently sure of the policy and indicated that felonies within the past 6 to 7 years and misdemeanors within the past 3 years would automatically disqualify applicants, she later clarified that the Progress policy is as it is represented on its website: applicants are automatically denied if they have felonies within 10 years or misdemeanors within 3 years.

59.    In early May 2024, an FHCCI staff member utilized the chat feature on the Progress website to inquire about Progress's criminal history policy. The FHCCI staff member indicated they had a friend interested in renting from Progress, and asked whether the friend would be denied if he had a felony from nine years ago. The FHCCI employee did not indicate where the friend was interested in renting, and the Progress agent did not ask.

60.    While the agent initially stated, "We go back 10 years for felonies. But it really depends on what it was for[,]" the agent later confirmed Progress's actual policy is as advertised on the website—the applicant would be disqualified for "anything like crimes against children, sex-related offenses, homicide, kidnapping, and drug sale, manufacturing, or distribution, or any felonies within the past 10 years." They further confirmed any of these would result in an "automatic denial."

61.    Later in May 2024, an FHCCI staff member conducted another investigative call to Progress's general customer service line to inquire about Progress's policy on applicants with criminal justice involvement. The FHCCI employee represented that they were a social worker volunteering with their church and wanted to understand Progress's application process and policies. After explaining some rental criteria, a Progress agent named Claire stated that if an applicant has a felony in the past 10 years, it would be an automatic denial, and if they had a misdemeanor in the past 3 years, it would also be an automatic denial. Claire further explained that for misdemeanors, they did not count things such as speeding tickets. The FHCCI employee asked if that meant that Progress had exceptions for certain offenses, such as, for example, a client with a felony drug charge from five years ago. Claire reiterated that if they had a felony from the last 10 years, then they would be denied, and Progress did not have exceptions for any specific felony.

62.     To further clarify the scope of Progress's criminal records policy, in late May 2024, an FHCCI staff member again called the Progress general line. The FHCCI employee represented that their sister and brother-in-law were looking for housing in the Phoenix, Arizona area, and inquired about approval criteria. They indicated that their brother-in-law, Demetrius, had a felony from nine years ago involving retail theft and asked if that would affect their application. A Progress representative named Tina replied that anything under 10 years would be an automatic denial and that if the brother-in-law applied, he would be automatically denied. The FHCCI employee then asked if that policy was just for properties in Phoenix, or if different properties in the state have different policies. Tina replied that the policies applied to all Progress Residential properties.

63.     In June 2024, an FHCCI staff member conducted a final investigative call. Progress representative Tina again confirmed that a felony in the past ten years or a misdemeanor in the past three years would result in an automatic denial, with the exception of certain alcohol misdemeanors.

64.     Through these investigative calls, FHCCI confirmed that the categorical ban advertised on Progress's website and applied to Mr. Williams was in fact broadly applied at Progress's thousands of properties across the country.

65.     In addition, FHCCI conducted telephonic surveys in December 2023, followed by mail surveys in January and May 2024, of Progress tenants. These

surveys included a tenant screening section that inquired about the tenant's experiences with Progress's application process, background checks, and denials (if any). Through the surveys, FHCCI again confirmed Progress applied its policy against renting to certain justice-involved applicants as early as 2017-2018.

66.    As FHCCI's investigative efforts confirmed, Progress has consistently applied its sweeping blanket ban, with devastating effects.

### D. Progress's Justice-Involvement Policy Discriminates Against Black Individuals

#### i. Progress's Blanket Ban Disproportionately and Severely Impacts Black Individuals

67.    Racial disparities in the criminal justice system are well-established, persistent, and widely known. Black individuals are incarcerated at rates significantly disproportionate to their numbers in the United States general population. As of 2022, at the national level, the overall rate of incarceration of Black individuals was 5.22 times that of white individuals.[9]

68.    These disparities persist among people released from incarceration. Nationally, almost half a million people are released from confinement each year.[10] Largely because the imprisoned population is disproportionately Black and 95% of

---

[9] See E. Ann Carson & Rich Kluckow, U.S. Dep't of Just., *Prisoners in 2022 - Statistical Tables*, Bureau of Just. Stats. 13 (Nov. 2023), https://bjs.ojp.gov/document/p22st.pdf [https://perma.cc/LDM6-4R5T].
[10] *Id.* at 19 (providing statistics for releases of individuals sentenced to a federal or state correctional facility in 2021 and 2022).

the imprisoned population is eventually released,[11] 35% of the formerly incarcerated

population—but only 12% of the overall population—in the United States is Black.[12]

69.    On the other hand, white people are incarcerated and released from jails

and prisons at rates significantly lower than their representation in the general

population at the national and state levels.

70.    As is generally the case with blanket bans, due to the wide and

persistent racial disparities described above, Progress's blanket ban has a clear

disparate impact on the basis of race. Black individuals are far more likely than white

individuals to have a criminal record. As a result, Progress's blanket ban operates to

disqualify otherwise-qualified Black individuals from living in its properties at

disproportionate rates.

71.    The likely impact of an exclusionary policy like Progress's can be

estimated using data from the United States Census Bureau, the Bureau of Justice

Statistics, and the Criminal Justice Administrative Records system.

72.    Presently available data indicates that nationally, the proportion of

Black people disqualified by Progress's blanket ban on renting to people with felony

convictions between 2012 and 2021 (within the ten years prior to 2021) is 8.16 times

---

[11] Devah Pager, *The Mark of a Criminal Record*, 108 Am. J. of Socio. 937, 938 (2003).
[12] Terry-Ann Craigie et al., *Conviction, Imprisonment, and Lost Earnings: How Involvement with the Criminal Justice System Deepens Inequality*, The Brennan Ctr. for Just. 10 fig. 1 (2020), https://www.brennancenter.org/our-work/research-reports/conviction-imprisonment-and-lost-earnings-how-involvement-criminal [https://perma.cc/4ZMT-5YNH].

greater than the proportion of white people disqualified. In other words, the proportion of disqualified Black people is 816% larger than the proportion of disqualified white people.

73.    Similarly, this data indicates that the proportion of Black people disqualified by Progress's blanket ban on renting to people with misdemeanor convictions between 2019 and 2021 (within the last three years of 2021) is 4.44 times greater than the proportion of white people affected. That is, the proportion of disqualified Black people is 444% larger than the proportion of disqualified white people.

74.    Black people are also overrepresented in the prison populations in each of the 19 states where Progress operates single-family rental homes: Indiana, Alabama, Arizona, Colorado, Florida, Georgia, Kansas, Kentucky, Mississippi, Missouri, Nevada, New Jersey, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas, and Utah. For example, data from 2021 shows that Black people comprise just 9% of Indiana's general population, but make up 31% of Indiana's incarcerated population. This data also shows astounding disparities for every state where Progress has homes:



75.     Similarly, in Marion County, Indiana, where Plaintiffs reside, the proportion of Black residents with felony convictions is 1.63 times greater than the proportion of white residents with a felony conviction (using data from March 2023 to March 2024). That is, the proportion of disqualified Black residents for that year alone is 163% larger than the proportion of disqualified white residents.

76.     These numbers likely understate the racially disparate impact of Progress's policy because the company excludes not only persons with any felony convictions within the past ten years, but also persons with convictions for certain enumerated felony offenses regardless of when they occurred, and persons with certain misdemeanor convictions within the past three years.

77.     The disproportionate adverse impact of Progress's blanket exclusion of justice-involved individuals on Black prospective tenants is clear from these

findings. This ongoing policy prevents prospective Black tenants—both those who apply and are rejected, and the untold number of potential Black applicants who did not even bother to apply to Progress because of the policy against renting to justice-involved persons articulated on the company's website—from living in the housing of their choice more often than it does prospective white tenants.

### ii. Giving Individualized Consideration to Applicants' Circumstances Is a Less Discriminatory Alternative That Would Satisfy Safety Concerns

78.    Progress's blanket ban on renting to certain justice-involved applicants is not necessary to achieve any legitimate nondiscriminatory business purpose. While Progress may argue that excluding justice-involved renters is justified by public safety concerns, a blanket ban is not necessary to satisfy that concern. Providing individualized consideration of each applicant's circumstances, including any prior justice-involvement, is a less discriminatory alternative that would serve public safety equally well.

79.    Nor can Progress rely on any concerns related to negative housing outcomes, such as failure to pay rent or lease terminations. In fact, a 2019 study found that most criminal offenses have no significant effect on housing outcomes.[13]

---

[13] *See* Cael Warren, *Success in Housing: How Much Does Criminal Background Matter?*, Wilder Rsch. 23 (Jan. 2019), https://www.wilder.org/sites/default/files/imports/AEON_HousingSuccess_CriminalBackground_Report_1-19.pdf [https://perma.cc/X9Q9-9JXQ] ("Most types of criminal offenses do not significantly increase a household's likelihood of a negative housing outcome when other observable factors are held constant.").

To the extent that a prior criminal offense may increase the likelihood of any negative housing outcomes, any such effect declines over time and becomes insignificant two years after a misdemeanor, and five years after a felony. A categorical ban that fails to account for the nature of the conviction, as well as other relevant factors, and/or applies an unreasonable lookback period, is therefore unnecessary to address any such concerns.

80.     Progress may protect public safety and prevent negative housing outcomes by employing an individual assessment that considers the nature of an individual's conviction, age at the time of the conduct, the amount of time since the conviction, and evidence of changed circumstances, among other factors. Such an individualized assessment allows justice-involved individuals who pose no realistic current or future threat to the community to obtain housing. This more targeted and narrower approach both protects public safety and is less discriminatory and exclusionary because it reduces the number of Black applicants who would be banned from Progress properties.

81.     This is precisely the framework that HUD has recommended that housing providers use in assessing potential applicants.

82.     In 2016, HUD issued guidance on the use of criminal records in housing transactions, recognizing that "[b]ecause of widespread racial and ethnic disparities

in the U.S. criminal justice system, criminal history-based restrictions on access to housing are likely disproportionately to burden African Americans and Hispanics."[14] It specifically warned that "[a] housing provider that imposes a blanket prohibition on any person with any conviction record – no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then – will be unable to meet [their] burden" to show that such a blanket policy is necessary to achieve a substantial, legitimate, nondiscriminatory interest.[15] That is because an individualized assessment that accounts for relevant mitigating information, such as the circumstances surrounding the criminal conduct, the age of the individual at the time of the conduct, their history as a tenant, and evidence of changed circumstances, is an obvious less discriminatory alternative to categorical exclusions.

83.    Major industry organizations including the National Multifamily Housing Council, the National Apartment Association, and the National Association of Realtors all disseminated information about the HUD Guidance and emphasized the importance of dispensing with automatic criminal history bans.[16] It is very

---

[14] U.S. Dep't of Hous. & Urb. Dev., *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the use of Criminal Records by Providers of Housing and Real Estate-Related Transactions* 10 (Apr. 4, 2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHA STANDCR.PDF [https://perma.cc/6EPM-2JBD].
[15] *Id.* at 6.
[16] Nat'l Multifamily Hous. Council, *Tips for Better Criminal Activity Screening* (Nov. 22, 2016), https://www.nmhc.org/news/articles/tips-for-better-criminal-activity-screening/

unusual for apartment companies to thoroughly disregard sound and well-known industry practices designed to prevent discrimination. Upon information and belief, Defendants have been aware of the HUD Guidance since its release.

84.    In a June 2022 Memorandum, HUD reaffirmed those principles and provided additional guidance and recommendations to facilitate implementation of the 2016 Guidance.[17] The June 2022 Memorandum recognized that housing providers' "written and unwritten policies and practices" concerning background screening may create an unjustified discriminatory effect in violation of the FHA, and reaffirmed that individualized assessment of relevant mitigating information from applicants with criminal justice involvement is likely to have a less discriminatory effect than categorical exclusions like Progress's.

## CLASS ALLEGATIONS

85.    Progress relies on the same applicant eligibility policies across its nationwide portfolio of more than 90,000 single-family homes. These policies

---

[https://perma.cc/3MB7-HLL8]; Nat'l Apartment Ass'n, *Fed Officials Warn Against Blanket Criminal History Exclusions* (Apr. 25, 2016), https://www.naahq.org/fed-officials-warn-against-blanket-criminal-history-exclusions [https://perma.cc/UAB7-DJGQ]; Nat'l Ass'n of Realtors, *What the Latest Fair Housing Guidance on Criminal Background Checks Means for Real Estate* (May 13, 2016), https://www.prnewswire.com/news-releases/what-the-latest-fair-housing-guidance-on-criminal-background-checks-means-for-real-estate-300268465.html [https://perma.cc/LF22-V6HQ].

[17] HUD, *Implementation of the Office of General Counsel's Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real-Estate Transactions* (June 10, 2022), https://www.hud.gov/sites/dfiles/FHEO/documents/Implementation%20of%20OGC%20Guidance%20on%20Application%20of%20FHA%20Standards%20to%20the%20Use%20of%20Criminal%20Records%20-%20June%2010%202022.pdf [https://perma.cc/US5G-VBLB].

harmed not just Mr. Williams, but the many other applicants who also faced automatic rejection because of their justice involvement.

86.     Mr. Williams accordingly brings this Complaint as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of himself and similarly situated individuals.

87.     Mr. Williams requests that this Court certify a nationwide class of all Black applicants who were otherwise qualified to rent with Progress but were automatically rejected from tenancy based on Progress's criminal history policy on or after January 1, 2016 ("the Class").

88.     Mr. Williams is a member of the Class he seeks to represent.

89.     The Class asserts claims under the federal Fair Housing Act, 42 U.S.C. § 3604.

90.     This action is properly maintained as a class action.

91.     The volume of Class members is sufficiently numerous that joinder of all members is impracticable. Progress has relied on a blanket criminal history ban since it internalized management of its single-family home portfolio around January 1, 2016. Throughout that time, the number of homes managed by Defendants has steadily increased and is now nearly 90,000. At the same time, the United States maintains a high rate of conviction and incarceration. Plaintiffs estimate that

Progress automatically rejected scores of applicants based on their justice involvement.

92.     Defendants have acted or refused to act on grounds generally applicable to the Class.

93.     There are questions of law or fact common to each class member. Such questions include, without limitation: (a) whether Progress's criminal history policy disproportionately excludes Black applicants; (b) whether such a disparate impact can be justified by business necessity; (c) whether there are available alternative screening policies that would have a less discriminatory impact; and (d) whether the Class members have sustained damages and the measure of those damages.

94.     Mr. Williams's claims are typical of those of the Class because: (a) he is a Black person; (b) he submitted a rental application to Progress and was automatically rejected by Progress based on its criminal history policy within the relevant time period; and (c) he was otherwise qualified to rent the unit to which he applied.

95.     Mr. Williams and class counsel will fairly and adequately represent the interests of the Class.

96.     Mr. Williams has no interests that are antagonistic to the interests of the Class as a whole.

97.    Class counsel have extensive experience in civil rights, consumer, and class action litigation.

98.    The Class is certifiable under Federal Rule of Civil Procedure 23(b)(2) as to liability and injunctive relief, because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

99.    The Class is certifiable under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case. Damages can be proven on a class-wide basis via generally applicable evidence.

100.    Alternatively, class-wide liability and punitive damages liability under the theories advanced in this action are properly certified under Federal Rule of Civil Procedure 23(c)(4) for the Class because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

## INJURY TO PLAINTIFFS

101.    As a result of Progress's discriminatory policy, Mr. Williams and those similarly situated suffered compensatory harm, including emotional distress, pain

and suffering, the injury to dignity associated with being stereotyped based on past justice-involvement as a proxy for race, and other injuries necessarily attendant to racial discrimination.

102.    Progress's categorical rejection of certain justice-involved applicants caused them emotional distress, pain, and suffering. For example, after Mr. Williams was rejected by Progress, he was unhoused for almost one month. The rejection and resultant complications in Mr. Williams's search for housing caused him the emotional distress, pain, and suffering that any person in this situation would necessarily experience.

103.    Progress's categorical rejection of applications from certain justice-involved applicants caused them to experience the harm and stigma inherent in racial discrimination. Knowing that one is being discriminated against on account of their race causes the exact injury to dignity that the Fair Housing Act was designed to prevent.

104.    Furthermore, Progress's unlawful conduct, policies, and practices have inflicted and continue to inflict concrete, particularized, and substantial injuries on Plaintiff FHCCI by impairing its mission and by impairing its ongoing programs and core activities.

105.    FHCCI's mission is to facilitate open housing for all people. This mission includes ensuring the availability of affordable and accessible housing;

promoting housing choice and homeownership; advocating for an inclusive housing market; working toward stable and equitable communities; and eradicating housing discrimination within Central Indiana, the State of Indiana, and nationally.

106.    FHCCI currently engages in programs and activities in furtherance of its mission. For example, FHCCI provides housing counseling and referral services to individual housing consumers and housing providers. Through its counseling work, FHCCI connects people with resources to help them locate housing options; to stave off eviction, foreclosure, or instability; to identify or access available housing programs; and to combat or address conflicts or inequities with their housing providers and/or housing services.

107.    FHCCI also engages in neighborhood stabilization and community investment through its "Inclusive Communities" program. This program has included investing in and repairing blighted properties; helping home seekers obtain credit; securing housing for families in need of urgent shelter; and preventing displacement of elderly and differently abled homeowners.

108.    FHCCI also lobbies for laws that will advance the organization's mission of open and accessible housing. This advocacy includes drafting issue statements and op-eds to propose and/or endorse new laws; meeting with regulators and policymakers; and identifying existing legislation that creates barriers to housing.

109.   FHCCI also conducts education and outreach. This programming includes authoring and releasing fact sheets and guidance; conducting trainings and information sessions; and organizing community events.

110.   Progress is one of the largest providers of single-family rental homes in the country, and it relies on exclusionary applicant screening policies and practices that automatically reject people based on justice involvement. These policies and practices harm FHCCI in at least three ways.

111.   Progress's rental screening policies and practices impair FHCCI's ongoing counseling and referral services, one of the organization's core activities. As part of its counseling program, FHCCI responds to inquiries from people with justice involvement by providing referrals and support in their search for housing. Because Progress's policies automatically exclude applicants based on justice involvement, there is less housing available for people with criminal histories. This decrease in housing availability impairs FHCCI's counseling and referral services. This impairment is especially harmful because FHCCI has seen a significant rise in the number of intakes from people with justice involvement. Already, the number of inquiries FHCCI has received from justice-involved individuals in 2024 is nearly three times the number of inquiries FHCCI received from this population in 2018.

112.   Progress's rental screening policies and practices also impair FHCCI's mission of ensuring open and affordable housing for all. People with justice

involvement have an acute need to find stable and affordable housing, which is often required by probation and/or parole terms, and which is essential to maintaining employment. FHCCI has seen an increase in outreach from justice-involved individuals who are unable to find housing because of their criminal histories. Although there is a demand for housing, especially for people with criminal histories, Progress's policies and practices restrict the available housing stock and shrink the single-family rental market. Given the size of Progress's rental portfolio, the impact of Progress's exclusionary practices is considerable.

113.    These injuries are not mere setbacks to the organization's abstract goals but rather direct and tangible impediments to FHCCI's ability to achieve its mission of facilitating open housing access for all people and to FHCCI's activities and programs.

114.    FHCCI has suffered further damages because the injuries to its mission and activities caused a consequent drain on the organization's resources. FHCCI was compelled to investigate and counteract Progress's discriminatory policies and practices, and it diverted scarce resources to do so.

115.    FHCCI has a small staff and a limited budget. Yet because Progress's policies present an ongoing impairment to FHCCI's mission, FHCCI diverted staff time and incurred expenses researching Progress's portfolio and policies; collecting documents; designing and implementing investigative calls; and drafting, mailing,

and reviewing surveys. This expenditure of resources was necessary to determine the scope and degree of Progress's discrimination.

116.    FHCCI also diverted staff time and resources to engage in outreach to the potentially affected residents within its service area to educate them regarding their fair housing rights in relation to the types of unlawful discrimination in which Progress was engaging. These education efforts included drafting a criminal history fact sheet for housing consumers; attending summits and expos hosted by reentry organizations; meeting with reentry organizations to discuss the needs of their clients; and conducting workshops and presentations for justice involved individuals. FHCCI also diverted resources to training local agencies regarding housing for people with justice involvement.

117.    FHCCI also diverted staff time and resources toward counseling Mr. Williams and investigating his experience with Progress.

118.    In carrying out activities, for which it had not budgeted time or money, to counteract the harm caused by Progress, FHCCI was forced to divert significant staff time and funds away from other planned activities. This diversion delayed, diminished, and interfered with FHCCI's core operations.

119.    FHCCI's investigation into Progress impaired the organization's ability to respond to inquiries from housing consumers and to provide timely counseling to clients.

120.    Because it diverted time and resources to investigating Progress, FHCCI had to delay research and drafting for five different public reports addressing environmental justice, the state of fair housing, investor-purchased properties, land contracts, and manufactured housing. The delay of these reports impaired FHCCI's mission and programming. Public reports are essential to one of FHCCI's core activities, education and outreach, because they raise awareness, generate clients and referrals, and promote industry-specific strategies for increasing open access to housing. If FHCCI had not diverted time to investigating Progress, it could have released its reports sooner, and thus seen swifter progress on those topics.

121.    The time FHCCI expended to investigate and counteract Progress's unlawful conduct thus perceptibly impaired FHCCI's mission and activities and thereby compounded and exacerbated the direct injuries inflicted by Progress's conduct.

122.    Progress's reliance on discriminatory screening practices has also harmed FHCCI's reputation. Because of Progress's reliance on discriminatory screening practices, FHCCI's ability to support housing choice for justice involved individuals has been diminished. This undermines FHCCI's role in the community—both with reentry organizations specifically and with potential funders and donors more generally—because FHCCI is not able to achieve its mission or serve those in need.

123.    Unless enjoined, Progress will continue to engage in the unlawful conduct described herein, and FHCCI's injuries will increase because it will have to continue diverting resources and curtailing its other activities to counteract Defendants' conduct.

## CAUSES OF ACTION

### Count I – Violation of the Fair Housing Act (42 U.S.C. § 3604)
### (All Plaintiffs vs. All Defendants)

124.    Plaintiffs repeat and incorporate by reference all allegations set for in paragraphs 1 through 122 above.

125.    Progress's acts, policies, and practices have an adverse and disproportionate impact on Black individuals as compared to similarly situated white people. This adverse and disproportionate impact is the direct result of Progress's ongoing blanket policy of automatically refusing housing to certain people with criminal records with no consideration of their individual characteristics and circumstances. This policy is not necessary to serve any substantial legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice—providing individualized consideration—that would have a less discriminatory effect.

126.    Progress's acts, policies, and practices constitute discrimination and violate the Fair Housing Act, as amended, 42 U.S.C. § 3604, and its implementing regulations, in that:

    a.  Progress's acts, policies, and practices have made and continue to make housing unavailable because of race in violation of 42 U.S.C. § 3604(a); and

    b.  Progress's notices and statements have expressed and/or continue to express a preference, limitation, and discrimination based on race in violation of 42 U.S.C. § 3604(c).

### Count II – Violation of Indiana Fair Housing Law
### (IND. CODE ANN. § 22-9.5)
### (Plaintiff FHCCI v. All Defendants)

127.    Plaintiffs repeat and incorporate by reference all allegations set for in paragraphs 1 through 122 above.

128.    Progress's acts, policies, and practices have an adverse and disproportionate impact on Black individuals as compared to similarly situated white people. This adverse and disproportionate impact is the direct result of Progress's ongoing blanket policy of automatically refusing housing to certain people with criminal records with no consideration of their individual characteristics and circumstances. This policy is not necessary to serve any substantial legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice—providing individualized consideration—that would have a less discriminatory effect.

129.    Progress's acts, policies, and practices constitute discrimination and violate the Indiana Fair Housing Act in that:

a.  Progress's acts, policies, and practices have made and continue to make housing unavailable because of race in violation of Ind. Code Ann. § 22-9.5-5-1; and

b.  Progress's notices and statements have expressed and/or continue to express a preference, limitation, and discrimination based on race in violation of Ind. Code Ann. § 22-9.5-5-2.

## DEMAND FOR JURY TRIAL

130.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant them the following relief:

(1)    Certify a class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(2)    Enter a declaratory judgment finding that the foregoing actions of Progress violate the federal Fair Housing Act and Indiana Fair Housing Act;

(3)    Enter an injunction enjoining Progress and its directors, officers, agents, and employees from continuing to publish, implement, and enforce the

illegal, discriminatory conduct described herein and directing Progress and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effect of the illegal discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(4)    Award compensatory damages to Plaintiffs in an amount determined by the jury that would fully compensate Plaintiffs for their injuries caused by the conduct of Progress alleged herein;

(5)    Award punitive damages to Plaintiffs in an amount determined by the jury that would punish Progress for the willful, malicious, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(6)    Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2) and Ind. Code Ann. § 22-9.5-7-2;

(7)    Award prejudgment interest to Plaintiffs; and

(8)    Order such other relief as this Court deems just and equitable.

DATE: November 20, 2024

Respectfully submitted,

*/s/ Matthew B. Keyes*

Matthew B. Keyes (#29315-49)
Russell B. Cate (#27056-29)
RILEYCATE, LLC
11 Municipal Dr., Suite 320
Fishers, IN 46038
P: (317) 588-2866
F: (317) 458-1785
Email: mkeyes@rileycate.com
        rcate@rileycate.com

*Attorney for Plaintiffs*

Valerie D. Comenencia Ortiz (*pro hac vice* application pending)
vcomenenciaortiz@relmanlaw.com
Ellora Thadaney Israni (*pro hac vice* application pending)
eisrani@relmanlaw.com
Lila Miller (*pro hac vice* application pending)
lmiller@relmanlaw.com
RELMAN COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, D.C. 20036
T: (202) 728-1888
F: (202) 728-0848

*Attorneys for Plaintiffs*